## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CATHY K. WILSON,** | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | CASE No. 06-CV-651-FHM |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the** | ) | |
| **Social Security Administration,**[1] | ) | |
| | ) | |
| DEFENDANT. | ) | |

## ORDER

Plaintiff, Cathy K. Wilson, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[2]   In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  Substantial evidence is more than a scintilla, less

---

[1]   On February 1, 2007, Michael J. Astrue was confirmed as Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Jo Anne B. Barnhart the former Commissioner, as defendant in this case.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]   Plaintiff's February 5, 2004 applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration.  A hearing before an Administrative Law Judge (ALJ) was held February 10, 2006.  By decision dated May 19, 2006, the ALJ entered the findings which are the subject of this appeal.  The Appeals Council denied review of the findings of the ALJ on September 25, 2006.  The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir. 2003). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 54 years old at the time of the hearing. [R. 350]. She claims to have been unable to work since July 26, 2002, due to carpal tunnel surgery with additional complications, rotator cuff surgery, left shoulder and arm surgery and possible neck problems. [Plaintiff's Disability Report, R. 63]. The ALJ determined that Plaintiff has severe impairments consisting of degenerative disc disease - cervical spine, status post carpal tunnel syndrome repair and right rotator cuff repair [R. 13], but that she retains the residual functional capacity (RFC) to perform light work activity with additional restrictions against overhead reaching and only occasionally grasping objects. [R.14]. Based upon the testimony of a vocational expert (VE), the ALJ determined that Plaintiff could not return to her past relevant work as a customer service clerk, credit analyst/specialist, skip tracer and supervisor for credit card services [R. 15] but found there are other jobs in the economy in significant numbers that Plaintiff could perform with that RFC. [R.16]. He concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 17]. The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps);

2

*Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the ALJ erred: 1) by formulating an RFC that failed to include all her limitations; 2) by failing to conduct a proper analysis of her credibility; and 3) at step five by determining there was other work she could perform. [Plaintiff's brief, p. 6]. For the reasons discussed below, the Court affirms the decision of the Commissioner.

## Medical Evidence

The record contains medical treatment information from as far back as 1996 and includes treatment records that are unrelated to Plaintiff's claimed impairments. [R. 134-146, 114-132, 279-299, 331-339]. Although the Court has reviewed the entire administrative record, only the medical evidence relating to Plaintiff's upper extremities and spine is referenced in this Order.

The earliest mention of cervical spine complaints found in the record are MRI reports dated January 3, 2001, from Cherry Street MRI. [R. 104-106, 133]. Results of the MRI indicate: "bony degenerative changes at C6-C7 with left paracentral/ posterolateral disk herniation at the same level, causing a slight compression on the left anterior aspect of the spinal cord (no stenosis of the sinal canal or neural foramen); otherwise negative MRI exam of the cervical spine, no significant bone, disk or soft tissue finding is seen, otherwise." [R. 133].[3]

A December 26, 2001, message left at Springer Clinic reports Plaintiff requested an appointment for right shoulder pain, radiating down the arm into the fingers with

---

[3] The date may be scrivener's error. The dictation and transcription dates are 1/3/2002 and the patient information sheet accompanying the handwritten notes are dated 1/3/02. [R. 105, 133].

numbness and tingling in the fingers. [R. 113].   Plaintiff was seen the next day at Springer Clinic by Dr. Frank D. Kondos. [R. 110-111].  He ordered x-rays which showed no significant radiographic abnormality. [R. 112].   On January 2, 2002, Dr. Kondos rechecked Plaintiff's shoulder and ordered an MRI. [R. 107-108].[4]  At follow-up visits on January 16 and 23, 2002, Plaintiff continued to complain of pain in the right shoulder. [R. 100-103].  On January 29, 2002, Plaintiff was seen by Bradford L. Boone, M.D., at the Eastern Oklahoma Orthopedic Center, Inc., who reported that the physical examination demonstrated positive rotator cuff impingement signs.[5] [R. 200].   His impression was calcific rotator cuff tendinosis and the possibility of some underlying carpal tunnel syndrome[6] as well.   He placed Plaintiff in physical therapy "heavy on modalities and stretching on her soft tissues" and injected her subacrominally with a Celestone/Marcaine solution. [R. 200].

On February 18, 2002, Dr. Boone reported Plaintiff was "doing well," that her motion was full but that she still had moderately significant cuff impingement signs." [R. 198].  Dr. Boone wrote on March 20, 2002, that he had discussed arthroscopic SAD

---

[4]  It is this MRI report that appears to be misdated.

[5]  The rotator cuff is a group of muscles and tendons that form a cuff over the shoulder. These muscles and tendons hold the arm in its "ball and socket" joint and help the shoulder to rotate. The role of the tendons is to hold the powerful shoulder muscles to the shoulder and arm bones. The tendons can be torn from overuse or injury. See medical definitions online: http://www.nlm.nih.gov/medlineplus /ency/article/007207.htm

[6]  Carpal tunnel syndrome is "a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow." *Dorland's Illustrated Medical Dictionary*, 28th ed., p. 1626. "This compression produces paresthesias in the radial-palmar aspect of the hand plus pain in the wrist, in the palm, or sometimes proximal to the compression site in the forearm and shoulder. Sensory deficit in the first 3 digits and/or weakness and atrophy in the muscles controlling thumb abduction and apposition may follow." *The Merck Manual*, (Robert Berkow, M.D., et al., eds., 16th ed. 1992), p. 1519.

(arthroscopic subacromial decompression) and postop rehab with Plaintiff and that he would recheck her in six weeks. [R. 197].  On April 4, 2002, Dr. Boone reported that Plaintiff was "failing conservative treatment" and recommended proceeding with arthroscopic SAD and excision of the calcific deposit. [R. 196].  Dr. Boone referred Plaintiff to Dr. Jim Bischoff for what appeared to be a carpal tunnel syndrome or medial nerve entrapment. [R. 195].

On June 12, 2002, Plaintiff was seen by Terrill H. Simmons, M.D., at the request of a Workers' Compensation Court (WCC) Judge. [R. 269].   Dr. Simmons found crepitation (crackling) about the right shoulder joint and at the ACL, pain down with pressure to the shoulder, good range of motion to the neck, limited motion with the right shoulder and pain with inversion and eversion of the right shoulder.  His impression was probable rotator cuff tear and carpal tunnel syndrome.  He recommended an EMG and MRI of the right shoulder.  Dr. Simmons reported his findings to the WCC Judge on June 26, 2002. [R. 265-266].  The MRI conducted on June 15, 2002, indicated rotator cuff tear, bicipital tendinitis and a small joint effusion and moderate bursal effusion. [R. 268].

On June 26, 2002, Dr. Simmons discussed the results of the MRI with Plaintiff but recommended waiting for the EMG results before making a definitive plan for treatment, noting that Plaintiff "may well need an MRI of the cervical spine." [R. 267]. The EMG studies were performed on July 22, 2002. [R. 207].  The findings were compatible with right median neuropathy at the wrist (carpal tunnel syndrome). [R. 207].

On August 14, 2002, Dr. Simmons reported that the EMG demonstrated carpal tunnel syndrome with a neuropathy at the wrist and that there was no evidence of a

5

cervical neuropathy. [R. 267].  He said treatment with an anti-inflammatory, wrist splint and corticosteroid injection will probably fail and that surgical intervention is the likely treatment. *Id.*  On April 9, 2003, Plaintiff's shoulder, wrist and some with her neck were continuing to be symptomatic. [R. 263].   The plan was to perform the carpal tunnel release first, then the shoulder repair  "and if she remains symptomatic long term then an MRI of her neck." *Id.*  The carpal tunnel release surgery was performed on May 19, 2003. [R. 261-264].  After the surgery, physical therapy was ordered. [R. 263].

On June 27, 2003, Dr. Simmons reported the carpal tunnel was doing well, that Plaintiff needed three more physical therapy visits to work out the sensitivity to the scar and that she was now ready for surgery on the shoulder which would entail a more difficult  recovery. [R. 261].  He noted some complaints of left shoulder pain as well. *Id.*

The rotator cuff surgery was performed on August 11, 2003. [R. 260-261].  Dr. Simmons ordered physical therapy at the followup examination on August 20, 2003. [R. 259].  He noted improvement and less pain, although Plaintiff still had pain radiating from the shoulder into her neck and down her arm on September 10, 2003. [R. 259]. Marked improvement in pain, well healed scar, motion getting back to normal but only fair strength and still significant pain were recorded by Dr. Simmons on October 8, 2003.  [R. 258].   At the November 7, 2003 followup appointment, Dr. Simmons determined four or five more physical therapy treatments should get Plaintiff "to the point that she can handle this on her own." [R. 257].  Plaintiff complained of some pain with the right wrist and the doctor noted a ganglion developing over the dorsum of the wrist. *Id.*  Complaints of pain in the left shoulder for which Plaintiff's attorney was

seeking treatment authorization were also noted. *Id.*  On December 12, 2003, Dr. Simmons recommended an MRI of the left shoulder. [R. 256].

The record contains a letter addressed to the WCC Judge from Richard M. Stamile, M.D., another physician at Tulsa Bone & Joint Associates, dated January 14, 2004. [R. 254-255].  He reported on his December 8, 2003 examination of Plaintiff's wrist, finding no evidence of ganglion formation or swelling and no evidence of carpal tunnel compression, noting negative Phelan and Tinel tests.  The injection he gave Plaintiff apparently had no effect and he recommended a repeat electromyogram and nerve conduction study. *Id.*

Dr. Simmons wrote Plaintiff's attorney on February 4, 2004, advising that an MRI of Plaintiff's left shoulder should be performed to rule out tendon injury or impingement syndrome as she had with the right shoulder. [R. 253, 256].

On May 28, 2004, Dr. Stamile's notes indicate that Plaintiff had not been seen since December 18, 2003, at which time an EMG and nerve conduction velocity was obtained and that study was unremarkable. [R. 256].  He reported that Plaintiff had called on multiple occasions complaining of similar discomfort involving the left upper extremity and that the court had approved an EMG and nerve conduction velocity on the left wrist which was normal. [R. 256, 270-277].  Dr. Stamile's letter to the WCC Judge on July 14, 2004, advised that the EMG on 4/29/04 was normal and that neither it nor the repeat EMG of the right upper extremity suggested etiology in the wrists or the neck "although there is a distinct possibility of bilateral apparent carpal tunnel syndrome are apparently cervical related." [R. 248].  He had no surgical procedure to recommend

and referred Plaintiff back to her regular physician, Dr. Terrill Simmons, for followup. *Id.*
There are no further treatment records from Dr. Stamile or Dr. Simmons in the record.

The record does contain an independent medical examination report by Dr.
Simmons addressed to the WCC Judge on March 28, 2005. [R. 323-324].  Dr. Simmons
summarized Plaintiff's treatment history and reported that at the time of the 2003 carpal
tunnel and right shoulder surgeries, Plaintiff was found to have degenerative disk
disease of the cervical spine at C5-C6 and was also having symptoms with the left
shoulder.  He advised an MRI of the left shoulder in August 2004 had demonstrated
mild degenerative joint disease and the EMG of the right wrist in April 2004 was
interpreted as normal.  Upon examination, Plaintiff had restricted motion to the neck,
pain with compression of the cervical spine, no definite neurological deficit and normal
neurological function and sensory exams.  The x-rays were abnormal.  Dr. Simmons
noted mild crepitation to both shoulders and pain with movement of the right shoulder.
He opined that Plaintiff's shoulders had reached maximal medical benefit and reported
that he would evaluate the cervical spine after an MRI. [R. 323].

The April 7, 2005 MRI revealed mild to moderate degenerative changes of the
cervical spine most prominent at C5-C6 level: "Mild posterior vertebral body bony
ridging with interposed disc. Question of tiny central disc protrusion. Preservation of
CSF anterior to the cervical spinal cord. Moderate right and mild left uncovertebral
spurring. Mild right neuroforaminal stenosis" and at C6-C7: "Mild posterior vertebral
body bony ridging with interposed disc." [R. 320].

The record contains a December 2, 2004 examination report by Kenneth R.
Trinidad, D.O., addressed to Plaintiff's attorney.  [R. 314-318].   He summarized

8

Plaintiff's surgical history, noting that Plaintiff had not been approved for any further followup by Dr. Simmons and that she remained symptomatic. [R. 314-315].   Her symptoms were described as: pain and paresthesias in the hands and wrists worsened with repetitive flexion and extension of the wrists and repetitive hand grip; nocturnal parathesias and while driving her car; decreased sensation in the fingers and weakness in grip strength bilaterally worse on the left as compared to the right; pain and stiffness in the shoulders bilaterally fairly constant in nature, worsened with movement and with weather change; crepitance, restricted movement and weakness in the shoulders; and stiffness and spasm in her neck. [R. 315].   Physical examination revealed: normal ranges of motion in the wrist bilaterally; positive Tinel's and Phalen's sign over the median nerves bilaterally; decreased sensation in the first three digits of the hands bilaterally; grip strength of 10 kilograms in the right hand versus 12 in the left; tenderness over the bicipital groove and acromioclavicular joint of the right shoulder; weakness in the muscles of the shoulder girdle; reduced range of motion in both shoulders; and tenderness, spasm and reduced range of motion in the cervical spine. [R. 315-316].   Dr. Trinidad recommended an MRI scan of the cervical spine to rule out disc derangement as a contributing factor to her shoulder and arm symptoms.   He opined that Plaintiff had not achieved maximum medical recovery, that she required further treatment and evaluation and he recommended two doctors for such treatment. [R. 317].   He stated Plaintiff remained temporarily totally disabled through the date of his report, continuing for an indefinite period of time. [R. 317-318].

C.B. Pettigrew, D.O., examined and evaluated Plaintiff on behalf of the WCC respondent on December 14, 2004. [R. 300-305].   After taking an extensive work and

medical history, Dr. Pettigrew reviewed Plaintiff's treatment records and conducted a physical examination.   It was her opinion that Plaintiff had sustained 8 percent permanent partial impairment to the body as a whole for injuries to the right shoulder; 5 percent permanent partial impairment to the right hand; no permanent impairment to the left shoulder or cervicothoracic spine;   that Plaintiff's period of temporary total disability had long since ended; that no further medical care or continuing medical maintenance was needed; and that Plaintiff "may continue her present employment." [R. 305].

Dr. Trinidad evaluated Plaintiff for permanent impairment ratings on August 17, 2005. [R. 306-313].   His findings, compared with his earlier examination, consisted of decreased grip strength in the left hand, greater flexion in the right and left shoulders, and tenderness and spasm in the cervical spine starting at C1, as opposed to C4 in the earlier report, but otherwise no change in flexion, extension, rotation and bending tests and the same neurological results as found in the earlier examination were recorded. [R. 308].  He said:

> With her current impairment she is unable to return to her former position as a clerical worker or computer worker and, in my opinion, will require vocational training to place her in a light duty job that does not require repetitive work with her hands.

[R. 312].

Dr. Simmons' final report to the WCC Judge on October 10, 2005, advised that the April 7, 2005 MRI had demonstrated C5-C6 mild disk desiccation, narrowing and anterior osteophytes, that there was a question of a tiny central disk protrusion and that C6-C7 showed mild to moderate changes. [R. 319].  He said: "Therefore, Ms. Wilson's

10

condition is stable.  There is not a herniated disk, at this stage.  She is not in need of surgical treatment.  She will require medical treatment of analgesics and anti-inflammatories to be taken on an intermittent basis.  She will have symptoms associated with the neck, but her condition is not such that she would require surgical intervention." *Id.*

Christopher G. Covington, M.D., wrote a consultation report on October 27, 2005. [R. 325-326].  Dr. Covington reiterated Plaintiff's subjective history of continuing symptoms in the right shoulder and right wrist despite the surgical repairs and left upper extremity symptoms because of overuse from the disuse of the right upper extremity. [R. 325].  He said Plaintiff was found to have abnormalities in the left shoulder as well.[7]

He wrote:

> Through all of this, the patient feels that the initial symptoms of the neck, medial scapula and arm have never been addressed specifically and she continues to complain of these issues.  Because of this, a repeat MRI scan of the cervical spine was obtained in April 2005.  This, interestingly, did demonstrate a significant disk protrusion at C5-6 on the right with the same changes at C6-7 that were present on the scan of 2002.

[R. 326].  Upon physical examination, Dr. Covington found:

> ... "a fairly decent range of motion of the cervical spine with minimal Spurling's sign with extension and rotation except for medial scapular pain.  She has weakness in the deltoid groups on the right because of the shoulder.  I did not find any extensor weakness of the right upper extremity.  The left upper extremity was normal to motor examination.  Reflexes were brisk and symmetric throughout both upper extremities. Back and lower extremities were grossly normal.

---

[7]  He did not cite studies that indicated this result.

[R. 326].  Dr. Covington concluded there has been a change of condition of the cervical spine with a new significant disk protrusion and suggested a block at the levels at the C5-6 and C6-7 to see whether or not significant pain reduction could be obtained in the neck and right upper extremity as a diagnostic and/or therapeutic trial or a possible discography to distinguish between concordantly symptomatic disk protrusions. [R. 326].

## The ALJ's Decision

The ALJ found that Plaintiff had severe impairments of degenerative disc disease - cervical spine, status post carpal tunnel syndrome repair and right rotator cuff repair. [R. 13].  After evaluating the medical evidence, the ALJ determined that with those impairments, Plaintiff has the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight-hour day and sit for six hours in an eight-hour day. [R. 14].  He concluded that Plaintiff cannot perform overhead reaching and that she can only occasionally grasp objects. *Id.*  With this RFC, and after taking testimony from a vocational expert (VE) at the hearing, the ALJ found Plaintiff is not able to return to her past relevant work (PRW) but that there are other jobs that exist in significant numbers in the economy that Plaintiff can perform.

## RFC Determination

Plaintiff contends the ALJ failed to formulate an RFC that included all her limitations. [Plaintiff's brief, Dkt. 21, p. 7].  She asserts the ALJ misstated the medical evidence, failed to consider the evidence in its entirety and failed to afford her treating physicians' opinions controlling weight.

12

Plaintiff complains the ALJ's RFC determination was improperly based upon Dr. Pettigrew's report which was written on behalf of the Workers' Compensation insurance carrier after a one-time examination. She argues Dr. Pettigrew's opinion [conflicted] with the opinion of Dr. Trinidad and that Dr. Trinidad's opinion was entitled to more weight because he was her treating physician.   Review of the medical record indicates otherwise.   Like Dr. Pettigrew, Dr. Trinidad saw Plaintiff only for evaluation for Workers' Compensation purposes, the first time for temporary total disability compensation, the second time for permanent partial disability ratings.   It is true that his opinion was entitled to consideration by the ALJ. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir.1989) (The ALJ is required to "evaluate every medical opinion" he receives and to "consider all relevant medical evidence of record in reaching a conclusion as to disability.").   However, Dr. Trinidad's reports were not entitled to the controlling weight Plaintiff describes.[8]   *See Doyal*, 331 F.3d at 762-63 ("Absent an indication that an examining physician presented the only medical evidence submitted pertaining to the relevant time period, the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion.").   Because both Dr. Trinidad and Dr.

---

[8]  A treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s) and any physical and mental restrictions. See 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).   The Commissioner will give controlling weight to that type of opinion if it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record.  20 C.F.R.§§ 404.1527(d)(2), 416.927(d)(2); *see Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003).  *See Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir.1987) ("[t]he treating physician rule governs the weight to be accorded the medical opinion of the physician who treated the claimant ... relative to other medical evidence before the fact-finder, including opinions of other physicians.").

Pettigrew were physicians who saw Plaintiff only for WCC evaluative purposes, their opinions were entitled to review under the regulations for evaluating other medical sources. *See* 20 C.F.R. § 404.1527(c).  As such, their opinions were to be considered and weighed as conflicting evidence which the ALJ was required to resolve.  *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (ALJ is tasked with resolving inconsistencies in the medical evidence).  The ALJ's decision indicates that he considered all the medical evidence in the record, including the competing reports of Dr. Pettigrew and Dr. Trinidad.

Contrary to Plaintiff's argument, the ALJ's decision also reflects that he considered Dr. Covington's report. [R. 13].  In explaining his findings, the ALJ discussed the medical evidence that he relied upon and adequately discussed the factors he considered in analyzing the evidence.  Included in that discussion were the findings of Dr. Simmons, the surgeon who performed the rotator cuff repair and rendered followup treatment as well as providing medical reports to the Workers' Compensation Court. To the extent Plaintiff urges the Court to reweigh the evidence, the Court declines.  *See Oldham v. Astrue*, 509 F.3d 1254, 1257-8 (10th Cir. 2007) (Although evidence may also have supported contrary findings, court may not displace agency's choice between conflicting views).

The ALJ considered the record as a whole and nothing in the record contradicts or overwhelms the ALJ's conclusion that Plaintiff's impairments limited her to light work[9] with additional restrictions against overhead reaching and more than occasionally

_____

[9]  "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b).

grasping objects.    The record contains substantial evidence supporting the ALJ's decision denying benefits. *See Oldham*, 509 F.3d at 1257-8 (court's review is limited to the sufficiency of the evidence, not it's weight).

## Credibility

In an argument closely related to Plaintiff's first allegation of error, Plaintiff complains that the ALJ did not properly evaluate her subjective allegations concerning her impairments because he misread the medical records. [Plaintiff's brief, Dkt. 21, p. 10-11].   As stated above, the Court has determined the ALJ did not err in his analysis of the medical evidence, which he compared to Plaintiff's testimony and the other evidence in the record, and that his decision is supported by substantial evidence. Credibility determinations are peculiarly within the province of the finder of fact, and when such determinations are supported by substantial evidence, it is not the Court's prerogative to disturb them.   *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir.2002) (quotation omitted). Because the ALJ identified specific and legitimate reasons for doubting Plaintiff's credibility, the Court defers to his findings.

## Hypothetical

Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision. *See Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991).  However, in posing a hypothetical question, the ALJ need only set forth those physical and mental impairments which are accepted as true by the ALJ.  See *Kepler v. Chater*, 68 F.3d 387, 392 (10th Cir. 1995) (citing *Talley v.*

*Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990) (stating that the ALJ is not bound by the vocational expert's opinion in response to a hypothetical question which includes impairments that are not accepted as true by the ALJ).

Plaintiff complains the ALJ erroneously failed to include "limited cervical spine issues and lingering symptoms of carpal tunnel syndrome despite previous surgery" in his hypothetical. [Plaintiff's brief, Dkt. 21, p. 13].   However, as pointed out by the Commissioner, the evidence does not support additional restrictions to the RFC assessed by the ALJ. [Defendant's brief, Dkt. 25, p. 11].   Hypothetical questions need only reflect impairments and limitations that are borne out by the evidentiary record. *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir.1996).

Plaintiff's argument with regard to the ALJ's reliance upon the number of jobs identified by the VE as a basis for his step five finding is likewise without merit.  The VE testified that 450 usher jobs in Oklahoma and 27,000 usher jobs in the nation; 1200 light information clerk jobs in Oklahoma, 82,000 in the nation; 700 sedentary information clerk jobs in Oklahoma, 45,000 in the nation; and 700 credit card interviewer jobs in Oklahoma, 30,000 in the nation, are available for an individual with Plaintiff's RFC. [R. 365-366]. Plaintiff presents no authority for her contention that "each of those three jobs exist in very small numbers" rather than the significant number determined by the ALJ. [R. 16].  The Court finds the ALJ's step five determination is supported by substantial evidence.

## Conclusion

The record as a whole contains substantial evidence to support the determination of the ALJ that Plaintiff is not disabled.  Accordingly, the decision of the Commissioner finding Plaintiff not disabled is AFFIRMED.

SO ORDERED this 3rd day of March, 2008.


FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE